## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GNC Franchising LLC and GENERAL NUTRITION CORPORATION, 300 Sixth Avenue, Pittsburgh, Pennsylvania 15222, | ) ) ) ) | Civil Action No. _____ |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| TROY C. and JENNIFER M. HUISENGA, 1612 West 15th Street, Spencer, Iowa 51301 | ) ) ) | |
| Defendants. | ) ) | |

GNC Franchising LLC and General Nutrition Corporation (herein, collectively "GNC"), by and through its undersigned counsel, files the following Complaint seeking injunctive relief and monetary damages, states as follows:

## I.    INTRODUCTION

1.    This case involves egregious conduct on the part of two owners of multiple GNC franchise stores, Defendants Troy C. Huisenga and Jennifer M. Huisenga (individually, "Mr. or Mrs. Huisenga," and collectively, "Defendants" or "the Huisengas"). Their actions potentially threaten the health and well-being of GNC's customers, violates applicable law, breaches their applicable franchise agreements and other agreements, and materially impairs the goodwill associated with GNC's trade name and trade mark. Upon information and belief, the Huisengas' conduct was done intentionally in order to generate more revenue for themselves, while threatening the public and GNC.

2.    As a result of the foregoing conduct, GNC terminated the applicable franchise agreements effective May 26, 2017. It has filed this action because Defendants have failed or refused to turn over ownership and control of their stores, thereby infringing GNC's rights,

1

goodwill, and trademarks and service marks.

## II.    THE PARTIES

3.    General Nutrition Corporation is a corporation organized under the law of the Commonwealth of Pennsylvania.  General Nutrition Corporation is the successor-by-merger of GNC Franchising, LLC, a Pennsylvania corporation. (References to "GNC" herein will refer to both the pre-merger and post-merger entities).  GNC's principal place of business is located at 300 Sixth Street, Pittsburgh, Pennsylvania 15222.

4.    Defendants Troy C. Huisenga and Jennifer M. Huisenga are residents and citizens of the State of Iowa with a primary residential address of 1612 West 15th Street, Spencer, Iowa, 51301.

## III.    JURISDICTION AND VENUE

5.     This Court has original subject matter jurisdiction of the claims herein pursuant to 28 U.S.C. §1331, as one or more of the causes of action arise under the laws of the United States, and 28 U.S.C. §1332 as the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, is in excess of seventy-five thousand dollars ($75,000.00).

6.    Defendants are subject to the personal jurisdiction of this Court pursuant to a forum selection clause agreed to by Defendants in the Franchise Agreements forming the basis of this action and because Defendants have regularly transacted business relating to this action in Pennsylvania and/or directed to entities within Pennsylvania.

7.    Venue is also proper in this Court pursuant to 28 U.S.C. §1391 because the Franchise Agreements which have been breached were signed by GNC in Pittsburgh, the harm to GNC is substantially focused on GNC's principal place of business and the Franchise

Agreement contains a forum selection clause in which the parties specifically agreed that any action brought by GNC against Defendants shall be brought in federal or state court within the Commonwealth of Pennsylvania in the judicial district in which GNC has its principal place of business.

**IV.   FACTUAL HISTORY**

**GNC Has Invested Substantial Resources to Develop Its Business and Reputation**

8.    GNC and its predecessors have been in business since 1935.

9.    GNC operates corporately owned retail stores and franchises which sell, among other items, vitamin and mineral supplements, sports nutrition products, herbs, health foods, natural cosmetics, diet products as well as general wellness products.

10.    In the decades it has been in business, GNC has invested substantial sums of money and resources to develop its brand and stores so that customers will not only recognize the GNC trade name and trade mark, but will know that all products sold meet certain standards of quality and freshness.  This is what is referred to in the applicable franchise agreements as the "GNC System."

11.    GNC manufactures many of the products it sells, while also contracting with various suppliers for the remainder of its products.  GNC has invested substantial sums of money and resources in its manufacturing and supply operations to ensure that all products manufactured or supplied meet certain standards of quality and freshness.

12.    Among the many efforts GNC takes to ensure quality, freshness and efficacy is developing expiration dates after which products cannot be sold and "best by" dates, which means the product is best if used by that date.

13.    GNC also invests substantial sums of money and resources each year in its goodwill and the GNC System through (a) marketing and advertising support, (b) operational

3

support, (c) auditing of stores so that they meet minimum standards regarding how each store is laid out and the quality and freshness of the products, (d) training its franchisees and managers so that everyone understands what is expected or required, and (e) reviewing and updating as appropriate policies and procedures relating to, among other things, the quality of products and when products can be sold.

14.     GNC protects its goodwill in many ways including through a provision in the parties' franchise agreement entitled, "GNC System," which in Section 11A provides, in pertinent part, as follows:  "General.  Franchisee acknowledges that franchising is a method of selling goods or services in a consistent manner and that store customers expect a similar shopping experience at a franchised business, regardless of its location or operator.  Franchisee recognizes the importance of these concepts and agrees to participate in and comply with the requirements of the GNC System, which promotes a uniform method of operating a retail nutrition, health and/or fitness store."  A true and correct copy of the Franchise Agreement is attached hereto as Exhibit 1.

15.     To ensure that its franchisees not only operate within the standards set by GNC, but also help develop and protect GNC's goodwill, GNC has developed a Franchise Operations Manual ("FOM"), which is over 300 pages in length, and provides detailed guidance to franchise owners regarding all facets of their franchise stores, including what products can be sold and when.

16.     Among other provisions, the FOM requires franchise operators ("franchisees") to "compete ethically in the marketplace" and "comply with applicable laws," including but not limited to requirements of the U.S. Food and Drug Administration, and prohibits any "form of misrepresentation made in connection with sales."  See FOM p. 1-2, 1-5, 1-6.  True and correct pages from the FOM are attached hereto and incorporate by reference herein as Exhibit 2.

17.     In regard to products, GNC authorizes franchisees to take "known losses," which

can allow the franchisee to recoup some or all of the costs they paid for such products under appropriate circumstances.  The FOM provides that "Known Losses account for merchandise that is no longer saleable.  They must be deducted from inventory."  Known losses include product that is damaged in the store … or outdated." FOM p. 7-4.

18.     In addition, to prevent product from becoming outdated, the FOM provides for a successive series of progressive price markdowns as products get close to the "best by" date. FOM p. 7-14-15.

19.     Once the best by date is reached, the FOM requires that expired product be known lossed and removed from the shelves.  Further, "[h]aving expired product available for sale may result in your default of your Franchise Agreement."  FOM p. 7-12.

20.     The FOM also provides a section on product tampering, which occurs whenever a franchisee "suspect(s) product tampering."  FOM p. 11-1.  It provides in pertinent part that "properly responding to a product tampering or tampering threat is extremely important.  As proven incidents and threats of tampering have become more frequent, our policy is to protect the consumer along with the good reputation of the company."  As a result, there is a strict procedure to be followed in such cases.  FOM 11-14-16.

21.     GNC's success is directly tied to the financial investment and countless hours it has put in to developing the goodwill in its trade name and trademarks, and to franchisees following the policies and procedures that have been developed to ensure products are safe and sold within the dates specified.

**The Huisengas are Experienced, Sophisticated Franchisees**

22.     The Huisengas purchased their first franchise on or about February 23, 1999, to operate a GNC store located at 8711 S. East Point Douglas Rd., Suite 10, Cottage Grove, MN 55016 ("GNC Store No. 7273").  Renewal Agreements were entered into on 2009 and 2014, respectively.  A true and correct copy of the Franchise Agreement is attached hereto as Exhibit

1.

23.     Based on their success in operating that franchise, the Huisengas purchased two additional franchises in 2003.  Specifically:

a.     On or about March 24, 2003, GNC and Defendants entered into a Franchise Agreement for Defendants to operate a GNC store located at Blairs Forest Plaza, 5418 Blairs Forest Way, Cedar Rapids, IA 52402 ("GNC Store No. 9146"). A true and correct copy of this Franchise Agreement are attached hereto as Exhibit 3; and

b.     On or about June 26, 2003, GNC and Defendants entered into a Franchise Agreement for Defendants to operate a GNC store located at Coral Ridge Mall, 1451 Coral Ridge Avenue, Coralville, IA 52241 ("GNC Store No. 9224").  A true and correct copy of this Franchise Agreement is attached hereto as Exhibit 4.

24.     Once again, based on their knowledge and expertise in operating GNC franchises, and the success of those stores, the Huisengas applied to purchase a fourth franchise, which GNC agreed to on or about June 29, 2006, when the parties entered into a Franchise Agreement for Defendants to operate a GNC store located at South Park Mall, 901 SW 11th Street, Spencer, IA 51301 ("GNC Store No. 9255").  A true and correct copy of this Franchise Agreement and Renewal is attached hereto as Exhibit 5.

25.     Finally, in 2015, based on their long involvement with GNC, their knowledge and expertise in operating GNC franchises and the success of those franchises, GNC and the Huisengas entered into the following five Franchise Agreements for a GNC Store(s) located at the following locations:

a.     On or about May 27, 2015, a Franchise Agreement for Defendants to operate a GNC store located at Lakeside Plaza, 17406 Lakeside Hills Plaza, Omaha, NE 68130 ("GNC Store No. 589").  A true and correct copy of this Franchise Agreement is

attached hereto as Exhibit 6.

b.      On or about November 20, 2015, a Franchise Agreement for Defendants to operate a GNC store located at Eagle Run, 13362 W. Maple Road, Omaha, NE 68164 ("GNC Store No. 993").  A true and correct copy of this Franchise Agreement is attached hereto as Exhibit 7.

c.      On or about November 24, 2015, a Franchise Agreement for Defendants to operate a GNC store located at River Hills Mall, 1850 Adams Street, Suite 127, Mankato, MN 56001 ("GNC Store No. 916").  A true and correct copy of this Franchise Agreement is attached hereto as Exhibit 8.

d.      On or about December 29, 2015, a Franchise Agreement for Defendants to operate a GNC store located at Lincoln Crossing, 5100 North 27th Street, Lincoln, NE 68521 ("GNC Store No. 5133").  A true and correct copy of this Franchise Agreement is attached hereto as Exhibit 9.

e.      On or about December 30, 2015, a Franchise Agreement for Defendants to operate a GNC store located Midtown Crossing at Turner, 3201 Farnam Street, #6103, Omaha, NE 68131 ("GNC Store No. 3975").  A true and correct copy of this Franchise Agreement is attached hereto as Exhibit 10.

26.     Based upon their 18 years of operating multiple GNC stores in different states, the Huisengas are sophisticated franchisees who are intimately familiar with the requirements and expectations for operating a GNC store.

27.     The nine franchises operated by the Huisengas (hereinafter referred to as "the GNC Stores") were also successful, generating $3,641,280 in gross sales in 2016, of which $796,281 were generated by Store 916.

28.     Based on the sales margins for the above sales, the Huisengas' franchises were successful.

29.     GNC substantially contributed to the foregoing success through the GNC System, training it provided and its financial support of the Huisengas, which included allowing the banks to take the first position in front of the amounts the Huisengas owed to GNC, and giving each store a protected territory.

30.     The GNC stores are each governed by valid and enforceable Franchise Agreements that were supported by adequate consideration.  The Franchising Agreements provide that they shall be interpreted and construed under the laws of the Commonwealth of Pennsylvania.

**Relevant Provisions of the Nine (9) Franchise Agreements**

31.     Unless otherwise noted below, the identified numbered Paragraphs are the same for all nine (9) of the Defendants' Franchise Agreements:

"3D.     Rights Upon Expiration or Termination.  Franchisee shall have no right to operate the Franchised Business or to use the System or the Proprietary Marks under this Agreement after the expiration of the Franchise Term or following any termination of this Agreement prior to the expiration of the Franchise Term."

\* \* \* \* \* \*

"12H.  Compliance with Manuals.  Franchisee shall operate the Store in strict conformity with such policies, procedures, methods, standards, and specifications as Franchisor may from time to time prescribe in the Manuals or otherwise in writing." [1]

\* \* \* \* \* \*

"12K.  Ethical Conduct.  Franchisee shall in all aspects of Store operations and in dealings with customers, suppliers, landlords, Franchisor and its Affiliates, other franchisees and the general public act in a professional manner and adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct.

---

[1] 2014 Franchise Agreement, Compliance with Manuals for Store 3975 is located at 11H

Franchisee agrees to refrain from any conduct, business or advertising practice which may be injurious or prejudicial to the business of Franchisor, the System, and the good will associated with the GNC Brand Supplements, the proprietary Marks, and other GNC stores. "

* * * * * *

"12L.   <u>Employees.</u>  Franchisee shall take such steps as are necessary to ensure that its employees preserve good customer relations, comply with the requirements and specifications set forth in this Agreement or prescribed in the Manuals or otherwise in writing, and comply with such dress code as Franchisor may prescribe, including, but not limited to, wearing GNC specified uniforms in a clean and neat condition and use of name tags at all times while working in the Store."

* * * * * *

"12M.  <u>Compliance with Laws.</u>  Franchise acknowledges and understands that Franchisee's storage, offer, and sale of certain products shall be subject to specific federal, state, and local laws and regulations, including rules and regulations of the Food and Drug Administration ("FDA"), the Consumer Product Safety Commission ("CPSC"), and the Federal Trade Commission ("FTC")."

* * * * * *

"15.   <u>Confidential Operating Manual.</u>  Franchise shall conduct its business in strict accordance with the Manuals, one (1) copy of which shall be furnished or otherwise made available electronically to Franchisee on loan for the term of this Agreement."

* * * * * *

"20B.  <u>Termination by Franchisor on Notice without Opportunity to Cure</u>.  Upon the occurrence of any of the following events, Franchisee shall be in default hereunder, the Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon receipt of notice by Franchisee:

(vi)   If Franchisee or any of its Principals, as applicable, fails to comply with the covenants in Section 22.A, 22.B and 22.C …;

(viii)  If Franchisee, or any of its employees, agents or representatives engage in fraudulent conduct….;

9

(xii)   If Franchisee engages in illegal activities on or about the Store premises or otherwise in connection with the operation of the Franchised Business;

(xiv)   If Franchisee… engages in any acts or omissions which violation applicable law; … engages in any conduct which creates a material risk of danger to health and safety; or engages in any activity which is likely to be directly or indirectly injurious or prejudicial to the goodwill associate with the Proprietary Marks;"

\* \* \* \* \* \*

"21B.   <u>Cessation of Franchised Business and Disassociation.</u>  Franchisee shall immediately cease to operate the Franchised Business and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor."

\* \* \* \* \* \*

"21E.   <u>Surrender of Possession; Assignment; Renovation.</u>  At Franchisor's option, and within three (3) business days after Franchisor gives notice to Franchisee, Franchisee shall turn over physical possession of the Store to Franchisor."

\* \* \* \* \* \*

"21F.   <u>Payment to Franchisor and Affiliates</u>.  Franchisee shall promptly pay all sums owing to Franchisor and its Affiliates, together with any advertising and promotional funds, including interest on overdue monies as described in Section 4.G.  In the event of termination for any default of Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of the personal property, equipment, inventory, and fixtures owned by Franchisee and on all premises operated hereunder at the time of default."

\* \* \* \* \* \*

"22A (ii).      <u>Business Protective Covenants Applicable During Franchise Term</u>. During the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall not, directly or indirectly, for itself, or through, on behalf of, or in conjunction with any other person or Entity; […] (ii) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the GNC System;"

10

\* \* \* \* \* \*

"22B (xiv).    Post-Termination/Transfer Business Protective Covenants."

\* \* \* \* \* \*

"29D.  Forum Selection; Venue.  …If Franchisor brings an action or other proceeding against Franchisee in any state or federal court located within the Commonwealth of Pennsylvania in the judicial district in which the Franchisor has its principal place of business, Franchisee accepts generally and unconditionally the *in personam* jurisdiction and venue of the aforesaid courts and waives any defense of *forum non conveniens*."

29H.    Attorney's Fees and Costs.  In any litigation … relating to or in connection with the Franchised Business, this Agreement or the relationship between the parties, to the extent the Franchisor is the prevailing party, Franchisor shall be entitled to recover its reasonable costs and expenses, including attorneys' fees, paralegal fees, investigative costs, and court cost incurred in connection therewith…."

32.    GNC leases each of the sites for the GNC Stores formerly franchised to Defendants from the respective shopping centers.  In connection with each of the Franchise Agreements, Defendants entered into a separate sublease with GNC for the store sites whereunder Defendants became obligated to GNC to pay rent relating to each store. Copies of the Subleases for Store No. 7273, Store No. 9146, Store No. 9224, Store No. 9255, Store No. 589, Store No. 993, Store No. 916, Store No. 3975, and Store No. 5133 are attached hereto as Exhibits 11, 12,13,14, 15, 16, 17, 18 and 19 respectively.

33.    In addition, the Franchise Agreement for Store 916, located in Mankato, Minnesota, which is the primary focus of this action, has a State Addenda included as Attachment E.  It provides, in relevant part, that termination of the franchise agreement must follow Minnesota law.  Pursuant to Minnesota Stat. Sec. 80C.14, a franchise can be terminated if the franchisee materially impairs the goodwill associated with the franchisor's (here, GNC) trade name, trademark or other commercial symbol associated with the franchisor, provided that

the franchisor gives the franchisee 24 hours to cure the impairments.

34.     Section 21M of the Franchise Agreement provides that, in the event that the Franchise Agreement for Store 916 is terminated, GNC shall have the right, upon written notice, to immediately terminate all other agreements between GNC and the franchisee.

**The Huisengas Have Materially Impaired GNC's Goodwill**

35.     The Huisengas, and each of them, have engaged in a pattern of intentional misconduct which have substantially impaired and will continue to impair GNC's goodwill if they are allowed to continue to operate their franchises.

36.     In particular, in March 2017, GNC conducted an audit of store 916 in which it found over one hundred (100) expired products on the shelves, some of which expired in 2015.

37.     Over the years, the Huisengas had been issued many approximately 20 written warnings for having expired product on the shelves, but in those instances the number of expired product was less than 10.  Therefore, not only does the FOM prohibit selling expired product, but GNC had specifically warned the Huisengas about this issue.

38.     While a few expired products may be the result of oversight, having over 100 expired products on the shelves indicates that the product was put there purposely.

39.     While having product on the shelves that had just gone past their expiration date may be the result of oversight or timing, having product on the shelves that expired in 2015 indicates that the product was put there purposely.

40.     Approximately 10 days before the audit of the store in March 2017, the Huisengas' Director of Franchise Operations was in the store and did not notice expired product, which is an indication that it was put on the shelves after she left the store.

41.     Having substantial numbers of expired product on the shelves substantially

impairs GNC's good will and trade name because, under the GNC System, "customers expect a similar shopping experience at a franchised business, regardless of its location or operator."

42.     Selling product after its expiration date, or removing the expiration date or "best by" so that the consumer would not know the date, substantially impairs the goodwill of GNC by undermining the quality of its products and services that it has spent decades and substantial sums of money and resources to develop.

43.     Offering for sale product shipped in interstate commerce with labels that have been altered or destroyed is a crime which violates the Food, Drug and Cosmetic Act, 21 U.S.C. § 331(k).

44.     On or about March 30, 2017, a customer reported that the Huisengas sold her supplement powder to enhance the production of breast milk for her nursing infant, which had been already been opened and used.   While in the store, the Huisengas told the customer that she would receive a 20% discount, without telling her why, if she purchased a container of the product, rather than capsules.  They also told her the product was in the back, not on the shelves. It was only when the customer returned home and opened the container that she realized that it had already been opened and used.

45.     Because she was afraid not only of the potential danger to her and her baby of using potentially tampered product, but also of the potential danger to other customers, she not only called to report the issue to GNC's customer service, but she also posted it on GNC's Facebook page, so that it could be viewed by any member of the public who visited that page. In the Facebook post, a copy of which is attached hereto as Exhibit 20 (except for the customer's name which has been removed for her privacy), the customer states "that is a huge safety concern!  I do not plan to shop their [sic] again.   I honestly don't even think it is legal

and will be researching that more."

46.     In the Facebook post, she also stated that when she spoke to a store person, he said that he had told her she was getting 20% off because it had already been opened.  As she said on Facebook and as she told GNC's customer service representative, she would "NEVER" have bought a product under such circumstances. (Emphasis in original).

47.     Although GNC does not have access to the posts, the customer told GNC's customer service representative that she had received responses on Facebook which told her, among other things, to report it to the Federal Food and Drug Administration.

48.     According to GNC's records, prior to selling the product to the customer, the Huisengas had submitted a claim to GNC for reimbursement for that product.  The product was originally returned to Store 916 on March 22, 2017, and presumably remained opened and stored in the backroom of the store for eight days until the Huisengas were able to resell it to an unsuspecting customer.

49.     Notably, upon information and belief, the sales slip identifies the sales person for the transaction as "Troy."

50.     Instead of removing the product from inventory, as it was required to do as a known loss, the Huisengas "double-dipped" by charging GNC and the customer for the same product.

51.     Selling product that had already been opened and subject to unsanitary conditions is a criminal violation of both federal and state law.  21 U.S. C. § 342, and Minn. Stat. 34A.01 - .09.

52.     While visiting another franchise owned by the Huisengas a few weeks later, a GNC auditor noticed that there were boxes of different types of expired product.  Because this

was so unusual, the auditor made a mental note of it and took some photos.

53.     Based on the above facts, GNC submits that the Huisengas may be moving expired or other known loss products from one store to another to avoid detection by GNC.

54.     The very public actions taken by the Huisengas and the customer constitute a substantial impairment of GNC's goodwill in its tradename and trademarks.

55.     The Huisengas' violation of federal and state law potentially puts GNC at risk of prosecution by the federal government and/or state's attorneys general, if it did not put an end to such violations.

56.     The Huisengas' heinous actions, and the public response to those actions, constitute a substantial impairment of GNC's goodwill in its tradename and trademarks.

**Termination of Franchise Agreement and the Huisengas' Response**

57.     On May 23, 2017, in accordance with the Franchise Agreement and Minnesota law, GNC sent Notice to Terminate to Store 916 and to the Huisengas' home, and gave the Huisengas 24 hours to cure.  A true and correct copy of the Notice is attached hereto as Exhibit 21.  The Notice was delivered on May 24, 2017 at 12:21 pm Central time.  See Exhibit 22.  To ensure the Huisengas had a full 24 hours to respond, GNC gave the Huisengas additional time to cure.  See Exhibit 23.

58.     In regard to their duty to cure, the Huisengas responded in writing on May 25, 2017.  A true and correct copy of the response is attached hereto as Exhibit 24.

59.     The Huisengas' response does not constitute an adequate cure for the reasons set forth in GNC Notice of Termination delivered on May 26, 2017.

60.     GNC store 916 was terminated as a result of the Huisengas failure to cure the violations set forth above related to selling opened product that had been returned, for tampering

with product by removing best by dates and for having extreme amounts of expired product on the shelves each of which substantially impairs GNC's goodwill.  A true and correct copy of the notice of termination is attached hereto as Exhibit25.

61.     Based on the termination of Store 916, GNC exercised its contractual right set forth in Section 21M of the Franchise Agreement, GNC terminated the remaining Franchise Agreements between GNC and the Huisengas by also sent eight Notices of Termination Without the Opportunity to Cure to the remaining eight (8) stores operated by the Defendants, copies of which are attached hereto as Exhibit 26.

62.     The Huisengas have not confirmed that they have agreed to turn over their stores. To the contrary, upon information and belief, GNC does not believe they will voluntarily turn over the stores.

63.     The termination of the Huisengas' Franchise Agreements risks hurting GNC's business because, as set forth above, the Huisengas were generating millions of dollars of sales per year with good margins.  It will take time to try to get the stores back to those sales and margins, if it is ever able to do so.  Nonetheless, given the gravity of the Huisengas' misconduct and violations of the law, GNC determined that it was the correct action to take.

64.     As of April 24, 2017, Defendants owed GNC $432,793 related to the operation of the GNC Stores.

65.     The Franchise Agreements require Defendants to pay all amounts due and owing upon termination, which they have did not.  Defendant also agreed in the Franchise Agreements to pay all costs and expenses, including reasonable attorney's fees, incurred by GNC in relation to the enforcement of the Franchise Agreements.

66.     In connection with the GNC Stores and as an inducement for GNC to enter into

the agreements, Defendants executed a document for each Franchise Agreement entitled "Guarantee" whereby Defendants agreed to be individually bound by all the terms and conditions of the Franchise Agreements and unconditionally guaranteed that all obligations to GNC under the Franchise Agreements (as well as any other agreement between GNC and Defendants) would be punctually paid and performed. A copy of each Guarantee is attached to the Franchise Agreements.

## COUNT I

## BREACH OF CONTRACT

67.     GNC hereby incorporates by reference the allegations set forth in Paragraphs 1 through 66 of this Complaint as if fully set forth herein.

68.     Defendants have failed and refused to meet their contractual obligations in a number of areas, including, but not limited to, violating the law, obligations to cease operations, comply with GNC rules and regulations, live up to important covenants, to surrender possession of their terminated stores, to take adequate steps to protect GNC customers and the GNC brand, to make payments when due under the aforementioned Franchise Agreements, Subleases, Product Sales Agreements, and Guarantee despite GNC's demand for such payments, and has thereby breached each of these contracts.

69.      As a direct result of Defendants' material breaches, GNC has sustained actual and consequential damages that will be established at trial.

## COUNT II

## BREACH OF CONTRACT:  BREACH OF POST-TERMINATION OBLIGATIONS OF FRANCHISE AGREEMENT

70.     GNC hereby incorporates by reference the allegations set forth in the prior paragraphs of this Complaint as if fully set forth herein.

71.     Defendant Franchisees have breached their post-termination contractual obligations under Sections 2.B, 16.A, 20.B, 21 and 22 of the Franchise Agreement.

72.     As a direct result of Defendant Franchisees' material breaches, GNC has sustained actual and consequential damages that will be established at trial.

**COUNT III**
**BREACH OF CONTRACT:  BREACH OF COVENANT NOT TO COMPETE**

73.     GNC hereby incorporates by reference the allegations set forth in the prior paragraphs of this Complaint as though fully set forth herein.

74.     As noted above, the Franchise Agreement contains a covenant not to compete that prohibits Defendant Franchisees from operating a store that sells products similar to those offered for sale in the GNC franchised store for a period of one year following termination of the franchise agreements within five miles of the store that were terminated.

75.     By engaging in the foregoing conduct Defendant Franchisees' have materially breached the terms of the covenant not to compete set forth in the Franchise Agreement (Exhibits 1 at §22.H).

76.     As a direct result of Defendant Franchisees' breach of the covenant not to compete, GNC has suffered and will continue to suffer irreparable injury that cannot adequately be compensated solely by monetary damages, and which gives rise to injunctive relief of the type sought herein.

**COUNT IV**
**TRADEMARK INFRINGEMENT, 15 U.S.C. §§ 1114 AND 1125(a)**

77.     GNC hereby incorporates by reference the allegations set forth in the prior paragraphs of this Complaint as though fully set forth herein.

78.     GNC is the owner of the valid and legally protectable Proprietary Marks

identified in the Franchise Agreements, including, *inter alia*, GNC®, and GENERAL

NUTRITION CENTER®.  Each of these marks has been federally registered and is

incontestable.

79.     Despite the termination of the Franchise Agreements, which terminated

Defendant Franchisees' right to use the Proprietary Marks, Defendant Franchisees' continues to

use the Proprietary Marks in the operation of the stores as though the Franchise Agreements

were not terminated.

80.     Defendant Franchisees' infringement by its continued use of GNC's Proprietary

Marks is designed to cause, and will likely cause customer confusion with GNC as the

Defendant Franchisees do not have the right to use the Proprietary Marks following the

termination of the Franchise Agreement.  Such potential customer confusion constitutes

irreparable harm.

81.     Defendant Franchisees' aforesaid conduct is in violation of trade mark

protections of 15 U.S.C. §§ 1114 and 1125(a), and at all relevant times is and has been willful,

malicious and in conscious disregard of GNC's rights under the Lanham Act.

82.     As a result of Defendant Franchisees' conduct in violation of the Lanham Act,

GNC has suffered and will continue to suffer irreparable injury that cannot be adequately

compensated by money damages, and which gives rise to injunctive relief of the type sought

herein pursuant to 15 U.S.C. § 1116.

83.     As a result of Defendant Franchisees' conduct in violation of the Lanham Act,

GNC has sustained actual and consequential damages that will be established at trial.

## COUNT V
## VIOLATION OF THE LANHAM ACT, 15 U.S.C. §1125(c) – DILUTION

84.     GNC hereby incorporates by reference the allegations set forth in the above

paragraphs of the Complaint as though fully set forth herein.

85.     The GNC Proprietary Marks are famous and are held in high esteem by consumers of GNC products.

86.     Defendant Franchisees' are making unlawful use of the Proprietary Marks in interstate commerce and the unlawful use did not begin until after the Proprietary Marks had become famous, well-recognized and held in high esteem by GNC's customers.

87.     Defendant Franchisees' unlawful use of the Proprietary Marks has diluted the distinctive quality of the Proprietary Marks by lessening the capacity of the unique marks to identify and distinguish GNC goods.

88.     Defendant Franchisees' aforesaid conduct is in violation of 15 U.S.C §1125 (c). GNC has sustained actual and consequential damages which will be established at trial.

**COUNT VI**
**VIOLATION OF THE LANHAM ACT, 15 U.S.C. §1125(c)-TARNISHMENT**

89.     GNC hereby incorporates by reference the allegations set forth in the prior paragraphs of this Complaint as though fully set forth herein.

90.     The GNC Proprietary Marks are famous and are held in high esteem by consumers of GNC products.

91.     Defendant Franchisees' are making unlawful use of the Proprietary Marks in interstate commerce and the unlawful use did not begin until after the proprietary Marks had become famous, well-recognized and held in high esteem by GNC's customers.

92.     Defendant Franchisees' unlawful use of the proprietary Marks has tarnished and disparaged the Proprietary Marks and resulted in a loss of the ability of the Proprietary Marks to serve as unique identifiers of GNC's products.

93.     Defendant Franchisees' aforesaid conduct is in violation of 15 U.S.C. §1125(c),

and at all relevant times is and has been willful, malicious, and in conscious disregard of GNC's rights under 15 U.S.C. §1125 (c).

94.     As a result of Defendant Franchisees' conduct in violation of 15 U.S.C. §1125(c), GNC has suffered and will continue to suffer irreparable harm that cannot adequately be compensated solely by monetary damages, and which gives rise to injunctive relief of the type sought herein and pursuant to 15 U.S.C.§1116.

95.     As a result of Defendant Franchisees' conduct in violation of 15 U.S.C. §1125(c), GNC has sustained actual and consequential damages which will be established at trial.

**COUNT VII**
**BREACH OF GUARANTEE**

96.     Under the terms of the Franchise Agreement, Defendant Franchisees are obligated to comply with all federal, state and local laws (Exhibit 1 at §5.A).

97.     As described above, Defendant Franchisees have violated the Lanham Act, and, therefore, Defendants Troy C. Huisenga and Jennifer M. Huisenga have thereby breached the Agreement and are jointly and severally liable for Defendant Franchisees -- violation of the Lanham Act and any damage award rendered against Defendant Franchisees' for violations of the Lanham Act.

**PRAYER FOR RELIEF**

WHEREFORE, GNC demands judgment in its favor and against Defendants as follows:

(i)     That the Court issue an injunction enjoining Defendants, their agents, servants, employees, officers, directors, attorneys, partners, partnerships, and representatives, as well as those persons in concert or participation with any of them, from using the Proprietary Marks, confidential methods, systems and techniques associated with GNC's System; continuing to use other Proprietary Marks associated with GNC's System; and/or continuing to use signs,

21

advertising materials, displays, and other proprietary information, including, all advertisements, promotional materials, computer programs, publications, distributions, copies, items of clothing, and/or any other printed or reproduced material which bear any of GNC's marks, including all of GNC's logos, designs, slogans, and distinctive color combinations;

(ii)     That the Court issue an injunction compelling Defendants, their agents, servants, employees, officers, directors, attorneys, partners, partnerships, and representatives, as well as those persons in concert or participation with them to:

        (a)     Immediately cease operating the nine GNC Stores franchised under the Franchise Agreements;

        (b)     Take the necessary steps to honor each and every post-termination obligation set forth in the Franchise Agreement;

        (c)     Take the necessary steps to honor GNC's right to reenter the lease premises; and

        (d)     Return all manuals and other confidential operating material provided to Defendants in connection with the operation of the store governed by the Franchise Agreements.

(iii)     That the Court order Defendants to account for all gains, profits, and advantages which have accrued to them, for their benefit, and/or which inured in any manner to them as a result of the wrongful acts of trademark infringement, dilution and tarnishment in violation of the Lanham Act, 15 U.S.C. §§1051 et. Seq., whichever is greater;

(iv)     That the Court award GNC compensatory, liquidated, and consequential damages as a result of Defendants breaches of the Franchise Agreements, Subleases, and Product Sales Agreements in an amount in excess of $75,000, plus interest, costs, and attorney fees;

(v)     That the Court award GNC all fees and costs incurred in this action, including all reasonable attorney's fees, pursuant to the terms and conditions of the Franchise Agreements;

(vi)      That the Court enter judgment against Defendant for prejudgment interest;

(vii)      That the Court award such other relief as this Court shall deem just and

equitable under the circumstances.

Dated: May 26, 2017                              Respectfully submitted,

*/s/ Peter J. Ennis*
Peter J. Ennis, Esq.
PA ID No.:45754
pennis@cozen.com
Cozen O'Connor
One Oxford Centre, 26th Floor
Pittsburgh, PA 15219
(412) 620-6512
(412) 275-2351 (Fax)

General Nutrition Corporation
Gary R. Kelly,
PA ID No. 59027
Gary-kelly@gnc-hq.com
300 Sixth Avenue
Pittsburgh PA 15222
(412) 288-4621 (phone)
(412) 338-8900 (Fax)